UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------x
MUJAHID NASIRUDDIN,

                                        Plaintiff,


        - against -

                                                        **OPINION & ORDER**

PLILER, ELMORE, O'KANE, McCOY,                           No. 21-CV-7044 (CS)
TOMLISON, LIMKHULER, FERRY,
KESSLER, GYURITS, CHRISTENSON,
GRANNELL, IOCOLONO, HURN,
DELASSANDRO, McPHILLIPS, WITKOWSKI,
DR. GIRIBILLINI, NURSE SANTORELLI,
KABONIC, GIBBS, JOHN DOE 1-10,
                                        Defendants.
--------------------------------------------------------------x

Appearances:

Mujahid Nasiruddin
Edgefield, South Carolina
*Pro Se Plaintiff*

David E. Farber
Assistant United States Attorney
Southern District of New York
New York, New York
*Counsel for Defendants*

Seibel, J.

        Before the Court is Defendants' motion to dismiss.  (*See* ECF No. 102.)[1]  For the

following reasons, the motion is GRANTED.

_____

        [1] The twenty named Defendants are:  Warden W.S. Pliler; Associate Warden Jasmine
Elmore; Captain Patrick O'Kane; Lieutenants Erik Christensen, Jr., (incorrectly sued as
"Christenson"), Jean Leimkuhler, (incorrectly sued as "Limkhuler"), Amanda McCoy, and James
Tomlinson, (incorrectly sued as "Tomlison"); Corrections Officers Anthony Dalessandro,
(incorrectly sued as "Delassandro"), Ryan Ferry, Andre Grannell, Stephen Gyurits, (incorrectly
sued as "Guyiruti"), Zakkary Hurn, Justin Iocolano, (incorrectly sued as "Iocolono"), Brian
Kessler, Richard McPhillips, and Eric Witkowski; Paramedics James Gibbs, Michael Kabonick,

## I.   **BACKGROUND**

For purposes of this motion, the Court accepts as true the facts, but not the conclusions, set forth in Plaintiff's Amended Complaint, (ECF No. 11 ("AC"))[2], and his original Complaint (ECF No. 1 ("Compl.")).  *See Voltaire v. Westchester Cnty. Dep't of Soc. Servs.*, No. 11-CV-8876, 2016 WL 4540837, at *3 (S.D.N.Y. Aug. 29, 2016) ("[A] court is permitted to consider factual allegations in *pro se* plaintiffs' preceding complaints in order to supplement those in amended complaints."); *Washington v. Westchester Cnty. Dep't of Corr.*, No. 13-CV-5322, 2015 WL 408941, at *1 n.1 (S.D.N.Y. Jan. 30, 2015) (court may give a *pro se* plaintiff the benefit of considering facts in original complaint even if they have not been repeated in amended complaint).[3]

### A.   Facts

*Pro Se* Plaintiff Mujahid Nasiruddin was incarcerated at FCI Otisville during the events relevant to this lawsuit.  (AC at 11.)[4]

---

(incorrectly sued as "Kabonic"), and Lauren Santorella, (incorrectly sued as "Santorelli"); and Dr. Raúl Gierbolini-Veláquez, (incorrectly sued as "Dr. Giribillini"), all of whom were Federal Bureau of Prisons ("BOP") correctional staff at the Federal Corrections Institution in Otisville, New York, ("FCI Otisville") during the events relevant to this lawsuit.  (*See generally* ECF No. 11.)  The Court will use the correct spelling of their names throughout this Opinion.

[2] All citations to Plaintiff's AC use the page numbers set by the Court's Electronic Case Filing ("ECF") system.

[3] Unless otherwise indicated, case quotations omit all internal citations, quotation marks, footnotes, and alterations.  The Court will send Plaintiff copies of any unpublished decisions cited in this ruling.

[4] There is confusion as to Plaintiff's current whereabouts.  The most recent Notice of Change of Address he filed lists his current address as 11918 Channel Mark Drive, Chesterfield, Virginia 23836.  (*See* ECF No. 101.)  The BOP inmate lookup tool, however, indicates that he is currently being held at the Federal Correctional Institution in Edgefield, South Carolina.  *See* FIND AN INMATE, https://www.bop.gov/mobile/find_inmate/index.jsp (select "BOP Register Number" from "Type of number" dropdown menu and enter "32770-037" in "Number" field).  As such, it appears that Plaintiff has again neglected to advise the Court as to an address change,

On July 21, 2021, when Plaintiff was housed in the Special Housing Unit ("SHU"), he informed Defendant McCoy that he was "feeling suicidal and needed to see a psychologist." (*Id.*)  Plaintiff was in hand restraints at that time and McCoy ordered him to place his hands through the tray slot of his cell so that his restraints could be removed.  (*Id.*; *see* Compl. at 2.)  In response, Plaintiff told McCoy that he did not want the hand restraints removed because he "knew he would definitely do something to harm himself."  (Compl. at 2; *see* AC at 11 ("I informed Lt. McCoy and 'all' correctional staff present that if I removed my restraints while still in the cell I would try to kill myself.").)  McCoy then "instructed her staff to take [Plaintiff] down hard to the floor," resulting in Plaintiff being "slammed" to the ground and held there with "severe force placed on [his] arms, head, and legs."  (AC at 11.)  Shortly thereafter, McCoy gave Plaintiff a "final order" concerning the removal of his hand restraints.  (Compl. at 2.)  Plaintiff complied and his hand restraints were removed by correctional staff, including Defendant Ferry. (AC at 12.)

After his restraints were removed, Plaintiff began making a noose out of his sheet, which he tied around a bed post and attempted to put around his neck.  (*Id.*)  Correctional staff then deployed pepper spray "all over [Plaintiff's] body."  (*Id.*)[5]  At that point, Plaintiff "submitted to hand restraints" and correctional staff entered his cell and forcibly threw him to the ground, while tightening his hand and leg restraints to "unbearable pressure."  *Id.*  Because his leg restraints were so tight, Plaintiff was unable to walk and was instead "dragged through SHU,"

---

despite repeated reminders from the Court that it is his responsibility to do so.  (*See, e.g.*, ECF Nos. 77, 79, 96.)

[5] Plaintiff's AC refers to pepper spray as "pepper gas," (*see, e.g.*, AC at 12-13, 16), but his Complaint refers to it as "pepper spray," (*see* Compl. at 3).  For the sake of clarity, the Court shall use the term "pepper spray" throughout this Decision.

(Compl. at 2), to the "D/S access door," (AC at 12).  While there, Defendant O'Kane instructed his staff to shove Plaintiff against a wall.  (AC at 12.)  Plaintiff was then taken through the D/S door, at which point Defendant Gyurits beat and shoved Plaintiff, while "yellin[g] and screaming" in Plaintiff's ear.  (*Id.* at 13.)  Gyurits and other unidentified staff then forced Plaintiff over the staff break table, which caused Plaintiff "excruciating pain" because all of his body weight was on his arms, which were restrained behind his back.  (*Id.*)  Plaintiff maintains that throughout that time, his hand and leg restraints were "super tight," which caused him "great pain."  (Compl. at 2.)

According to Plaintiff, he was then taken to the shower where he received "improper decontamination from the [pepper spray]" and was placed in a holding cell, where he experienced "unbearable pain all over [his] body" due to the tight restraints.  (AC at 13.)  Plaintiff maintains that he received no assistance from correctional staff despite his pleas to Defendants Grannell and Leimkuhler.  (*Id.*)  Plaintiff told Defendant Kabonick about the pain he was experiencing due to the "excessive tightness" of his restraints, but Kabonick replied that "the restraints were fine," (*id.*), a response Plaintiff describes as "callous[], un[caring], and very unprofessional," (*id.* at 14).  Kabonick and an escort then transported Plaintiff by wheelchair to the shower for a second decontamination, during which they "put a few drops of water on [Plaintiff's] hands and do[u]sed a few drops of water in [his] face and stated that was good enough."  (*Id.*)

Plaintiff was then returned to a holding cell for an indeterminate period of time, at which point "someone" made the decision to place him on suicide watch in the medical building.  (*Id.*)  Plaintiff, however, was not allowed to enter the suicide watch cell before Lieutenant Munos – a nonparty – removed the cell's mattress, allegedly at O'Kane's direction.  (*Id.*)  This left Plaintiff

"to sleep on a concrete block." (Compl. at 3.) Plaintiff maintains that the cell was also

"unbearably hot," because there was "no fan to circulate any air," (AC at 15), and that his body

felt like it was "on fire" because he "still had pepper spray all over [him]" and correctional staff

"refuse[d] to give [him] a shower," (Compl. at 3).

On July 22, 2021, Plaintiff asked Defendant Gierbolini-Veláquez of the Psychology

Department about the mattress and accused him of allowing O'Kane to "conduct punitive actions

against [Plaintiff] by removing the mattress on [O'Kane's] order." (AC at 15.) Later that day,

Christensen, Gyurits, and an unnamed correctional officer removed Plaintiff from the suicide

watch cell to check for contraband, while harassing him and calling him vulgar names. (*Id.* at

15-16.)

On July 23, 2021, Plaintiff returned to his cell in the SHU, at which point his cellmate

Rochelle told him that he (Rochelle) was having suicidal thoughts. (*Id.* at 16.) Rochelle also

informed Grannell and Christensen of his "mental condition," and in response they "only

laughed." (*Id.*) Rochelle then made a noose and placed it around his neck, at which point

Defendant Hurn used pepper spray on Rochelle and Plaintiff. (*Id.*) Correctional staff then

placed Plaintiff and Rochelle in hand restraints, removed Plaintiff from the cell, threw him to the

ground, pressed knees into his back, and "painfully hyper extended" his arms. (*Id.* at 17.) While

Rochelle was taken "to the outside recreation area for fresh air," Plaintiff was placed in a holding

cage in SHU and not given "proper decontamination." (*Id.*) When Defendant Santorella arrived

to perform an injury assessment, Plaintiff told her that his hand restraints were too tight and that

he was in "severe pain." (*Id.* at 17.) He also stated that his knees were bleeding. (*Id.*) In

response, Santorella compared his knee injuries to a "bicycle scrape" and gave him no treatment

for his wounds. (*Id.*)

Plaintiff claims that at some point on July 22, O'Kane ordered correctional staff to assign him to a cell that "could not be monitored by camera" so that "whenever staff had to deal with [him], staff could not be monitored." (*Id.* at 18.)  As a result, Plaintiff stopped leaving his cell for showers. (*Id.*)  This led to Plaintiff being forced to wear paper clothes, which correctional staff "intentionally ripped off" as he walked toward his cell on one occasion, causing him to be "nude from the waist down" by the time he got there. (*Id.*)

On October 13, 2021, Defendant Kessler placed Plaintiff in hand restraints, entered Plaintiff's cell, acted aggressively towards Plaintiff, and caused spittle to land on Plaintiff's face. (*Id.*)  Kessler also "intentionally destroy[ed]" certain unidentified personal property of Plaintiff's. (*Id.* at 19.)  When Plaintiff commented on the property destruction, Kessler used both his hands to grab Plaintiff around the neck and throat, choking Plaintiff with "severe strength and pressure." (*Id.*)  According to Plaintiff, his cellmate Derrick Parks witnessed Kessler's actions as Parks was being "rushed past the cell" by Defendant Witkowski. (*Id.*)  Plaintiff was "on the verge of losing consciousness" when Kessler released Plaintiff's neck, after he heard correctional staff approaching the cell. (*Id.*)[6]  After releasing Plaintiff, Kessler told him, "That felt good." (*Id.*)  Plaintiff repeatedly told the responding correctional staff, including Correction Officer Khan – a nonparty – Defendant Witkowski, and Defendant Gibbs, that Kessler had choked him. (*Id.*)  According to Plaintiff, Gibbs told him that "he didn't care what Kessler was doing to [Plaintiff]." (*Id.*)

Shortly after the choking incident, Plaintiff was escorted to a holding cell where Defendant Tomlinson interviewed him and took pictures. (*Id.* at 20.)  According to Plaintiff,

---

[6] Plaintiff maintains that Kessler was not wearing a "body alarm" during the choking incident. (AC at 19.)

Tomlinson "never made any notes of [Plaintiff's] statement" concerning the incident with Kessler, and before leaving, Tomlinson told him, "It's time for you to leave here, I'm sick of you." (*Id.*)  Gibbs then performed an injury assessment of Plaintiff, during which he only took a blood pressure reading and did not check for bruises or ask Plaintiff whether he was in pain or experiencing any soreness. (*Id.* at 20-21.)  Plaintiff also maintains that he did not receive an Incident Report in connection with the choking incident, despite his having filed an Inmate Request and speaking to two non-party prison officials about the incident. (*Id.* at 19-20.)

Plaintiff alleges that he was denied out of cell recreation for a one-week period from late September to early October in 2021, due to staff participating in "Correctional Workers Appreciation Week." (*Id.* at 21.)  During the following week, Plaintiff only had one of his five allotted recreation hours. (*Id.*)  Plaintiff also identifies other examples of harassment by certain Defendants, including O'Kane, who "flipped [him] the middle finger," kicked his cell door, and placed a "hot pink I.D." on Plaintiff's door, and Witkowski, who denied him clean clothes after a weekend with no showers. (*Id.* at 22.)

According to Plaintiff, these events have resulted in foot and hand neuropathy, psychological trauma, shoulder and neck pain, back strain, scrapes, bruises, and "contamin[ation]" with pepper spray. (*Id.*)

## B.  Procedural History

Plaintiff filed his original Complaint naming the United States of America as Defendant on August 19, 2021. (*See* ECF No. 1.)  On October 18, 2021, the Court entered an Order of Service dismissing Plaintiff's claims against the United States pursuant to 28 U.S.C. § 1915(e)(2)(B)(iii) and adding John Doe defendants pursuant to Federal Rule of Civil Procedure

21, given Plaintiff's failure to name the prison officials involved in the alleged deprivation of his rights.  (*See* ECF No. 6.)  Plaintiff then filed his AC on November 3, 2021.  (*See* ECF No. 11.)

On December 21, 2022, Defendants filed a pre-motion letter in anticipation of a motion to dismiss.  (*See* ECF No. 87.)  The Court on March 29, 2023 held a premotion conference, at which it granted Plaintiff leave to file a Second Amended Complaint ("SAC").  (*See* Minute Entry dated Mar. 29, 2023.)  The SAC was due by May 22, 2023, (*id*.), and despite the Court extending the time to December 4, 2023, (ECF No. 96), Plaintiff never filed one, (*see* ECF Nos. 99-100).  The instant motion, which Plaintiff did not oppose, followed.  (*See* ECF Nos. 102, 105.)

## II.   LEGAL STANDARDS

### A.   Rule 12(b)(6)

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Twombly*, 550 U.S. at 555.  While Federal Rule of Civil Procedure 8 "marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, . . . it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions."  *Iqbal*, 556 U.S. at 678-79.

8

In considering whether a complaint states a claim upon which relief can be granted, the court "begin[s] by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth," and then determines whether the remaining well-pleaded factual allegations, accepted as true, "plausibly give rise to an entitlement to relief." *Id.* at 679. Deciding whether a complaint states a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'shown' – 'that the pleader is entitled to relief.'" *Id.* (alteration omitted) (quoting Fed. R. Civ. P. 8(a)(2)).

## B.     *Pro se* Plaintiffs

Complaints by *pro se* plaintiffs are to be examined with "special solicitude," *Tracy v. Freshwater*, 623 F.3d 90, 101-02 (2d Cir. 2010), interpreted "to raise the strongest arguments that they suggest," *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir. 1994), and "held to less stringent standards than formal pleadings drafted by lawyers," *Hughes v. Rowe*, 449 U.S. 5, 9 (1980) (*per curiam*).  Nevertheless, "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," and district courts "cannot invent factual allegations" that the plaintiff has not pleaded.  *Chavis v. Chappius*, 618 F.3d 162, 170 (2d Cir. 2010).

Where, as here, "a *pro se* plaintiff fails to oppose a motion to dismiss, [a] court must still determine whether the complaint states a claim upon which relief may be granted."  *Chandler v. City of N.Y.*, No. 17-CV-4030, 2018 WL 3387199, at *2 (S.D.N.Y. May 14, 2018), *report and recommendation adopted*, 2018 WL 3384439 (S.D.N.Y. July 11, 2018); *see also McCall v. Pataki*, 232 F.3d 321, 322-23 (2d Cir. 2000) ("[T]he sufficiency of a complaint is a matter of law

that the court is capable of determining based on its own reading of the pleading and knowledge of the law.  If a complaint is sufficient to state a claim on which relief can be granted, the [*pro se*] plaintiff's failure to respond to a Rule 12(b)(6) motion does not warrant dismissal.").

## III.   <u>DISCUSSION</u>

Liberally construed, Plaintiff's pleadings seek damages for several alleged violations of the Eighth Amendment, including (1) the use of excessive force by Defendants on three occasions; (2) deliberate indifference to his medical needs; and (3) cruel and unusual non-medical conditions of confinement; and an alleged violation of the Fifth Amendment, for (4) Kessler's destruction of Plaintiff's personal property without due process.  (*See generally* AC.)[7]

Such damages claims against federal officials arise under *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971), in which "the Supreme Court held that a plaintiff had an implied private right of action for damages against federal officers who violated the plaintiff's Fourth Amendment rights against unreasonable search and seizure when they handcuffed him inside his home without a warrant."  *Bravo v. U.S. Marshals Serv.*, No. 22-CV-6736, 2023 WL 4763207, at *6 (S.D.N.Y. July 26, 2023); *see Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 66 (2001) (In *Bivens* the Supreme Court "recognized for the first time an implied

---

[7] Because Plaintiff's first three "alleged constitutional claims arose while he was incarcerated, they are covered by the Eighth Amendment," "which prohibits cruel and unusual punishments during confinement, [and] protects prisoners from excessive force, deliberate indifference to a serious medical need, and failure to intervene."  *Doumin v. Carey*, No. 06-CV-1119, 2008 WL 4241075, at *4 (N.D.N.Y. Sept. 12, 2008).  Plaintiff's claim that Kessler destroyed his personal property without due process of law arises under the Fifth Amendment, rather than the Fourteenth, as he was in federal custody at the time of the alleged violation.  *See Dusenbery v. United States*, 534 U.S. 161, 167 (2002) ("The Due Process Clause of the Fifth Amendment prohibits the United States, as the Due Process Clause of the Fourteenth Amendment prohibits the States, from depriving any person of property without due process of law.").

private action for damages against federal officers alleged to have violated a citizen's

constitutional rights.").  The Supreme Court has since extended *Bivens* twice:

> (1) under the Fifth Amendment's due process clause for gender discrimination
> arising out of a Congressman's firing of his female secretary, *Davis v. Passman*,
> 442 U.S. 228 (1979), and (2) under the Eighth Amendment's cruel and unusual
> punishment clause arising out of prison officials' failure to treat a[] prisoner's
> asthma, which resulted in the prisoner's death, *Carlson v. Green*, 446 U.S. 14
> (1980).

*Bravo*, 2023 WL 4763207, at *6.

"These three cases – *Bivens*, *Davis*, and *Carlson* – represent the only instances in which

the Court has approved of an implied damages remedy under the Constitution itself."  *Ziglar v.

Abbasi*, 582 U.S. 120, 131 (2017).  More recently, "the Court has made clear that expanding the

*Bivens* remedy is now a disfavored judicial activity" and "has consistently refused to extend

*Bivens* to any new context or new category of defendants."  *Id.* at 135; *see Bravo*, 2023 WL

4763207, at *6 ("In recent years, the scope of relief available under *Bivens* has been sharply

curtailed.").  In other words, the Supreme Court has "for almost 40 years . . . consistently

rebuffed requests to add to the claims allowed under *Bivens*."  *Hernandez v. Mesa*, 589 U.S. 93,

101-02 (2020); *see Egbert v. Boule*, 596 U.S. 482, 486 (2022) (the Supreme Court "h[as]

declined 11 times to imply a similar cause of action for other alleged constitutional violations");

*id.* at 491 (the Supreme Court "h[as] emphasized that recognizing a cause of action under *Bivens*

is a disfavored judicial activity").

Given these directives from the Supreme Court, a court "determin[ing] whether it is

appropriate . . . to extend a *Bivens* remedy to the claims of a particular case," *Bravo*, 2023 WL

4763207, at *7, must "engage in a two-step inquiry," *Edwards v. Gizzi*, No. 20-CV-7371, 2022

WL 309393, at *5 (S.D.N.Y. Feb. 2, 2022); *see Kaid v. Tatum*, No. 20-CV-3643, 2024 WL

946949, at *8 (S.D.N.Y. Jan. 24, 2024) (to "assess . . . whether a *Bivens* cause of action is

available [Courts] us[e] [a] cohesive – and narrow – two-step test"), *report and recommendation adopted as modified*, 2024 WL 639331 (S.D.N.Y. Feb. 15, 2024).  First, "a court must . . . determine whether the claim presents a new *Bivens* context."  *Bravo*, 2023 WL 4763207, at *7; *Kaid*, 2024 WL 946949, at *8 ("[A] court must first ask if the case is different in a meaningful way from previous *Bivens* cases decided by the Supreme Court.").

> Differences that are meaningful enough to make a given context a new one include:  the rank of the officers involved; the constitutional right at issue; the generality or specificity of the official action; the extent of judicial guidance as to how an officer should respond to the problem or emergency to be confronted; the statutory or other legal mandate under which the officer was operating; the risk of disruptive intrusion by the Judiciary into the functioning of other branches; or the presence of special factors that previous *Bivens* cases did not consider.

*Kaid*, 2024 WL 946949, at *8-9.

"If the court determines that the claim at issue differs meaningfully from previous *Bivens* cases, [it] must then determine if it is appropriate to imply a new private right of action to that claim."  *Bravo*, 2023 WL 4763207, at *7.  To do so, "the court must ask if there are special factors counseling hesitation in the absence of affirmative action by Congress, in which case a court should decline to extend *Bivens*."  *Kaid*, 2024 WL 946949, at *9.  "[T]he 'special factors' inquiry 'must concentrate on whether the Judiciary is well suited, absent congressional action or instruction, to consider and weigh the costs and benefits of allowing a damages action to proceed.'"  *Bravo*, 2023 WL 47653207, at *7 (quoting *Ziglar*, 582 U.S. at 136).  "Among those factors is whether alternative remedies exist for addressing the constitutional violations raised by the claims of a particular case."  *Id.*; *see Bettis v. Grijalva*, No. 21-CV-7505, 2023 WL 4141869, at *4 (S.D.N.Y. June 23, 2023) ("Another relevant consideration is whether Congress has created any alternative, existing process for protecting the injured party's interest that itself may amount to a convincing reason for the Judicial Branch to refrain from providing a new and freestanding remedy in damages.").

At bottom, "courts must be mindful that the Supreme Court has warned that the *Bivens* remedy is an extraordinary thing that should rarely if ever be applied in new contexts," *Bettis*, 2023 4141869, at *4, and that "[i]f there is even a single reason to pause before applying *Bivens* in a new context, a court may not recognize a *Bivens* remedy," *Egbert*, 596 U.S. at 492.

### A.  Excessive Force

Plaintiff alleges that Defendants used excessive force against him in violation of the Eighth Amendment on three occasions:  on July 21, 2021, when he was pepper sprayed, restrained, and removed from his cell after informing McCoy that he felt suicidal, (*see* AC at 11-15); on July 23, 2021, when his cellmate had a similar episode and both he and Plaintiff were pepper sprayed and forcibly restrained, (*see id.* at 16-17); and on October 13, 2021, when Kessler grabbed him by the neck and choked him, (*see id.* at 18-19).

But "[c]ourts have consistently found that excessive force cases arising under the . . . Eighth Amendment . . . present new *Bivens* contexts." *Edwards*, 2022 WL 309393, at *6 (collecting cases); *see Mendoza v. Edge*, 615 F. Supp. 3d 163, 170 (E.D.N.Y. 2022) ("[P]laintiff's allegations that the defendants used excessive force against him when they responded to the fire he started in his cell . . . fall outside of *Bivens*' purview."); *Ramirez v. Tatum*, No. 17-CV-7801, 2018 WL 6655600, at *5 (S.D.N.Y. Dec. 19, 2018) ("The Supreme Court has recognized only three *Bivens* contexts, none of which include . . . excessive force."); *Ojo v. United States*, No. 16-CV-4112, 2019 WL 3852391, at *13 (E.D.N.Y. Aug. 15, 2019) (Eighth Amendment excessive force claim presented new *Bivens* context because "no Supreme Court decision has ever extended *Bivens* to encompass the specific context presented by plaintiff's excessive force claims."), *report and recommendation adopted*, 2019 WL 4602823 (E.D.N.Y. Sept. 23, 2019); *Akande v. Phillips*, No. 17-CV-1243, 2018 WL 3425009, at *9

13

(W.D.N.Y. July 11, 2018) ("Plaintiff's excessive use of force claim . . . under the Eighth

Amendment" presented a new *Bivens* context "since no Supreme Court decision has ever

extended *Bivens* to encompass th[at] specific context").

That is particularly so where the officers named as defendants are materially different

from the federal narcotics agents in *Bivens*. *See, e.g.*, *Edwards*, 2022 WL 309393, at *7

(excessive force claim presented a new context in part because "the officers involved in *Bivens*

were federal narcotics agents, an investigatory and enforcement force, whereas here, the officers

include U.S. Marshals and other court security officers, forces principally engaged in the

protection of federal judicial process and the execution of warrants authorized by a judicial

officer"); *Style v. Mackey*, No. 17-CV-1691, 2020 WL 3055319, at *4 (E.D.N.Y. June 8, 2020)

(differentiating Deputy U.S. Marshals from the federal narcotics agents in *Bivens*); *Martinez v.

D'Agata*, No. 16-CV-44, 2019 WL 6895436, at *7 (S.D.N.Y. Dec. 16, 2019) (finding new

*Bivens* context in part because "the type of officers involved in *Bivens* were DEA agents,

whereas here the officers were appointed members of a federal task force").  Here, none of the

Defendants had investigatory or law enforcement roles.  To the contrary, Defendants are all BOP

personnel with security or medical roles in the correctional facility in which Plaintiff was held.

(*See generally* AC.)  Their conduct in reacting to situations involving inmate safety and security

is wholly unlike that of the narcotics agents who engaged in the allegedly illegal search and

detention in *Bivens.*

Because Plaintiff's Eighth Amendment excessive force claims present a new *Bivens*

context, the Court must determine whether there are any special factors that counsel hesitation.

*See Hernandez*, 589 U.S. at 101-02.  Such factors include "the existence of an alternative

remedial scheme, the manner in which the Congress has structured its regulatory authority, the

burden of a damages remedy on the Government and individual employees, or any other unforeseeable factor that would counsel restraint." *Crespo v. Hurwitz*, No. 17-CV-6329, 2020 WL 7021658, at *5 (E.D.N.Y. Nov. 30, 2020).

Defendants argue that several alternative remedial schemes preclude the extension of *Bivens* to Plaintiff's claims, including the Federal Tort Claims Act, 28 U.S.C. §§ 2671-80 ("FTCA"), the Prison Litigation Reform Act ("PLRA")'s Administrative Remedy Program, and *habeas corpus* relief. (*See* ECF No. 103 ("Ds' Mem.") at 12-14.)

They are correct that "the existence of the FTCA and its associated administrative processes as an alternative avenue of redress is a reason to decline to extend the *Bivens* remedy." *Dean v. Robinson*, 656 F. Supp. 3d 400, 412 (W.D.N.Y. 2023); *see Wiley v. Fernandez*, No. 19-CV-652, 2024 WL 779392, at *7 (N.D.N.Y. Jan. 19, 2024) (declining to extend *Bivens* where the FTCA allowed plaintiff to "seek[] damages for the same harm alleged in his *Bivens* claim"), *report and recommendation adopted*, 2024 WL 939224 (N.D.N.Y. Mar. 5, 2024); *Bravo*, 2023 WL 4763207, at *9 ("[N]umerous courts in this district have found the FTCA to be an alternative remedy to *Bivens*."). Similarly, the Supreme Court has made clear that "*Bivens* relief [i]s unavailable because federal prisoners c[an], among other options, file grievances through [the PLRA's] Administrative Remedy Program." *Egbert*, 596 U.S. at 497; *see Caraballo v. Pliler*, No. 21-CV-10476, 2023 WL 3467185, at *8 (S.D.N.Y. May 15, 2023) (declining to extend *Bivens* because "[t]he BOP's own . . . administrative remedy program . . . provides an alternative, existing process . . . to remedy the alleged harms.").[8] The existence of these

---

[8] Because the FTCA and the Administrative Remedy Program provided Plaintiff with alternative remedies precluding his excessive force *Bivens* claims, "this Court need not decide whether . . . *habeas* relief . . . did as well." *Turkmen v. Ashcroft*, No. 02-CV-2307, 2021 WL 4099495, at *6 (E.D.N.Y. Sept. 9, 2021).

"alternative remedial structures . . . [standing] alone, . . . is reason enough to limit the power of the Judiciary to infer a new *Bivens* cause of action," particularly as "[i]t does not matter if those existing remedial structures do not provide complete relief or are not as effective as an individual damages remedy."  *Cohen v. United States*, 640 F. Supp. 3d 324, 338 (S.D.N.Y. 2022); *see Egbert*, 596 U.S. at 493.

Accordingly, the Court "decline[s] to recognize a *Bivens* claim for the use of excessive force by prison officials" and Plaintiff's excessive force claims must be dismissed.  *Bettis*, 2023 WL 4141869, at *6.

## B. <u>Deliberate Indifference to Medical Needs</u>

Plaintiff alleges that certain Defendants violated the Eighth Amendment by (1) failing to appropriately treat the pain, swelling, bruising, and scrapes caused by his restraints and the force that other Defendants used on him, and (2) failing to sufficiently decontaminate him after two instances of pepper spray use.  (*See* AC at 14, 17, 19-21.)

While Plaintiff's allegations may appear similar to those in *Carlson*, which concerned an inmate's medical needs and the Eighth Amendment, "the severity of the alleged indifference to [Plaintiff's] medical needs varies substantially from that presented . . . in *Carlson*."  *Kaid*, 2024 WL 946949, at *11; *see Bravo*, 2023 WL 4763207, at *8.  In *Carlson*, the defendants were "fully apprised . . . of the seriousness of [plaintiff's] chronic asthmatic condition" and nevertheless "kept him in th[e] facility against the advice of doctors, failed to give him competent medical attention for some eight hours after he had an asthmatic attack, administered . . . drugs which made his attack more severe, attempted to use a respirator known to be inoperative which further impeded his breathing, and delayed for too long . . . his transfer to an outside hospital," all of

which worsened his condition and led to his death.  446 U.S. at 16 n.1; *see Bravo*, 2023 WL 4763207, at *8.

In contrast, Plaintiff alleges that Defendants downplayed the severity of his injuries, including swelling, scrapes, and bruises, failed to comprehensively examine him or treat his injuries, and were otherwise callous and unprofessional when interacting with him.  (*See* AC at 14, 17-21.)  Simply put, such "allegations of deliberate indifference . . . are dramatically less severe than the conduct at issue in *Carlson*," which actively worsened the plaintiff's condition, "leading to his death."  *Kaid*, 2024 WL 946949, at *11; *see Bravo*, 2023 WL 4763207, at *8-9 (finding that "severity of the alleged indifference to [plaintiff's] medical needs varie[d] substantially from that . . . in *Carlson*" where "defendants were not fully apprised of the alleged deficiencies in the care provided to [plaintiff]" and "are not alleged to have provided affirmatively deleterious treatment to him"); *Cruz v. Hastings*, No. 20-CV-4392, 2021 WL 4691375, at *6 (S.D.N.Y. Oct. 6, 2021) (allegations that "prison officials disregarded [plaintiff's] safety by not changing his cell after [he was assaulted by] his cellmate – is clearly and meaningfully different from a failure to provide life-saving medical care to an inmate with asthma").

Similarly, while the Court does not discount any pain and discomfort that Plaintiff may have experienced, there are no allegations in any of his submissions from which it can be plausibly inferred that any of his injuries presented a life-threatening medical emergency of the sort at issue in *Carlson*.  *See, e.g.*, *Kaid*, 2024 WL 946949, at *11 ("[Plaintiff's] allegations fail to support a plausible inference that his foot and ankle, while painful for several weeks, ever presented a life-threatening condition."); *Edwards*, 2022 WL 309393, at *7 (deliberate indifference claim concerning a broken arm which caused "extreme pain" presented a new

*Bivens* context); *Wiley*, 2024 WL 779392, at *6 (deliberate indifference claim "arises in a new *Bivens* context" where "plaintiff's back injury and medication denial [were] not life threatening").  As such, Plaintiff's "medical condition and care . . . were different from *Carlson*" and his Eighth Amendment deliberate indifference claim presents a new *Bivens* context.  *Wiley*, 204 WL 779392, at *5 (collecting cases).

Next, as with Plaintiff's excessive force claim, the existence of alternative remedies under the FTCA and pursuant to the Administrative Remedy Program strongly militate against the extension of *Bivens* here.  *See Bettis*, 2023 WL 4141869, at *7 ("[T]he existence of a tort remedy for deliberate indifference to medical needs under the FTCA by itself strongly counsels against the creates [*sic*] of a *Bivens* remedy.") (collecting cases); *Caraballo*, 2023 WL 3467185, at *8 (availability of *habeas* relief and Administrative Remedy Program "counsel hesitation about granting the [*Bivens*] extension").

Accordingly, Plaintiff's Eighth Amendment deliberate indifference claim cannot proceed under *Bivens* and it must be dismissed.

### C.  Conditions of Confinement

Plaintiff also advances a *Bivens* claim concerning certain non-medical conditions of confinement, including an "unbearably hot" suicide watch cell which had no mattress or air circulation, the denial of out of cell recreation time, the use of paper clothes, the denial of clean clothes after a weekend with no showers, and the use of a "hot pink I.D." on his cell door.  (*See* AC at 14-15, 18, 21-22.)

But "an allegation of inhumane conditions of confinement is not one of the circumstances to which *Bivens* has previously been applied."  *Cantatore v. Pullen*, No. 22-CV-1232, 2023 WL 4826557, at *4, (D. Conn. July 27, 2023); *see Rodriguez v. Easter*, No. 20-CV-1872, 2022 WL

356478, at *7 (D. Conn. Feb. 7, 2022) ("No Supreme Court decision has extended *Bivens* to encompass the conditions of confinement claims asserted by Plaintiff."). As such, Plaintiff's claim presents a new *Bivens* context. *See Crespo*, 2020 WL 7021658, at *5 ("[Non-medical] conditions of confinement claims [represent] . . . an extension of *Bivens* into a new context."); *White v. Hess*, No. 14-CV-3339, 2020 WL 1536379, at *7 (E.D.N.Y. Mar. 31, 2020) ("[Plaintiff's] non-medical conditions of confinement claims bear little resemblance to a claim against FBI agents for handcuffing a man in his own home without a warrant; a claim against a Congressman for firing his female secretary; and a claim against prison officials for failure to treat an inmate's asthma, and therefore present a new *Bivens* context."); *Sebolt v. Tyndall*, No. 19-CV-429, 2021 WL 4948959, at *3 (S.D. Ind. Oct. 25, 2021) ("Since *Carlson* was decided, the [Supreme] Court has rejected attempts to extend *Bivens* to other contexts involving conditions of confinement under both the Eighth and Fourteenth Amendments" and thus "allegations of unconstitutional conditions of confinement in a federal prison" are "a new *Bivens* context") (collecting cases); *Menard v. Mansi*, No. 21-CV-2130, 2021 WL 2156366, at *4 (E.D. Pa. May 27, 2021) ("Courts have held that *Bivens* will not be extended to reach non-medical care conditions of confinement claims filed by prisoners in federal custody") (collecting cases); *see also Ziglar*, 582 U.S. at 140 (Fourth and Fifth Amendment claims challenging non-medical conditions of confinement "bear little resemblance to the three *Bivens* claims the Court has approved in [previous cases]" and are "a new *Bivens* context").

And as with his foregoing claims, the existence of alternative remedies under the FTCA and pursuant to the Administrative Remedy Program are special factors which strongly caution against the extension of *Bivens* here. *See Cantatore*, 2023 WL 4826557, at *4; *Rodriguez*, 2022 WL 356478, at *7; *Sebolt*, 2021 WL 4948959, at *4-5. Likewise, Plaintiff also "could have

sought *habeas* relief related to the conditions of his confinement . . . ." *Caraballo*, 2023 WL
3467185, at *8; *see Cohen*, 640 F. Supp. 3d at 339-41 (ability of "prisoners in federal custody
[to] seek *habeas* relief related to the conditions of their confinement" constitutes an "alternative
remedial structure" that precludes *Bivens* relief).

Because *Bivens* does not extend to Plaintiff's non-medical conditions of confinement
claim, it too must be dismissed.

### D.  Deprivation of Property Without Due Process

Finally, the Court construes the AC to raise a Fifth Amendment due process claim, as he
alleges that Kessler "intentionally destroy[ed] [his] personal property."  (AC at 19.)

While the Second Circuit has previously held in *dictum* in a summary order that "a
plaintiff may bring a *Bivens* action against individual federal agents who intentionally deprive
him of his property without due process of law," *Adekoya v. Fed. Bureau of Prisons*, 381 F.
App'x 35, 37 (2d Cir. 2010) (summary order), that case predates the Supreme Court's decisions
in *Ziglar*, *Hernandez*, and *Egbert*, all of which sharply curtailed the availability of the *Bivens*
remedy and "made clear that expanding the *Bivens* remedy is now a disfavored judicial activity."
*Ziglar*, 582 U.S. at 135.

Consistent with that case law, courts in other circuits have held that Fifth Amendment
claims concerning property damage or destruction are "meaningfully different from the *Bivens*
trilogy and clearly present[] new *Bivens* contexts" and that the existence of "alternative remedial
scheme[s] . . . warrants hesitation in extending *Bivens*" to encompass such claims.  *Daughtry v.
Englade*, No. 22-CV-240, 2023 WL 7386702, at *18-20 (E.D. Tex. Oct. 17, 2023); *see, e.g.*,
*Davis v. United States*, No. 21-CV-1551, 2022 WL 18284665, at *5 (C.D. Cal. Nov. 22, 2022)
(rejecting plaintiff's attempt to raise Fifth Amendment *Bivens* claim because "claims against the

BOP Officer Defendants . . . based on an alleged violation of his Fifth Amendment Due Process

clause rights for deprivation of his personal property . . . present a new context" and "Plaintiff

has two alternative remedies available to him:  (1) a small claims dispute via 31 U.S.C. § 3723,

which allows federal agency heads to settle claims for damaged or lost property based on the

negligence of federal employees; and (2) the BOP's administrative grievance process . . . .");

*Lucarelli v. Mallia*, No. 21-CV-525, 2021 WL 11114485, at *2-4 (M.D. Pa. Nov. 3, 2021)

(rejecting plaintiff's request for damages in connection with Fifth Amendment due process claim

"[b]ecause no Supreme Court Decision has ever extended *Bivens* to encompass the context

presented by . . . plaintiff's . . . claim"), *report and recommendation adopted*, 2021 WL

11114481 (M.D. Pa. Dec. 3, 2021); *United States v. Marquez*, No. 21-51116, 2022 WL

17335821, at *2 (5th Cir. Nov. 30, 2022) (affirming denial of leave to amend to raise *Bivens*

claim for deprivation of property "[b]ecause none of the Supreme Court's cases recognize a

*Bivens* claim for the deprivation of property").  The Court is persuaded by the reasoning of these

cases and agrees that a Fifth Amendment due process claim for the deprivation of personal

property presents a new *Bivens* context and that the availability of alternative remedies, such as

the Administrative Remedy Program, precludes any extension of *Bivens* to encompass such

claims.  *See Davis*, 2022 WL 18284665, at *5.

Even if Plaintiff could pursue a Fifth Amendment claim under *Bivens*, it would fail on the

merits.  "[A]n unauthorized intentional deprivation of property does not constitute a violation of

the procedural requirements of the Due Process Clause if a meaningful postdeprivation remedy

for the loss is available."  *Lewis v. Weiss*, No. 12-CV-7242, 2016 WL 1718251, at *6 (S.D.N.Y.

Apr. 27, 2016); *see Tyson v. FBI*, No. 22-CV-3555, 2022 WL 1557000, at *2 (S.D.N.Y. May 16,

2022) ("[B]ecause the [FTCA] provides an adequate post-deprivation remedy for property loss

due to the random, unauthorized actions of federal agents, and this remedy is available to Plaintiff for any such loss, the allegations do not state a procedural due process claim under the Fifth Amendment."); *Douglas v. BOP Director*, No. 19-CV-1015, 2019 WL 6170734, at \*3 (C.D. Cal. Nov. 20, 2019) ("[A] prisoner cannot state a constitutional claim for the deprivation of property where the government provides an adequate post-deprivation remedy.  A meaningful remedy exists through the Prison Administrative Remedy Program.  An adequate remedy also exists through 31 U.S.C. § 3723(a).").  Because Plaintiff had postdeprivation remedies available for any property damaged or destroyed by Kessler, including the FTCA and the Administrative Remedy Program, his right to due process was not violated.  *See, e.g.*, *Thompson v. Sadowski*, No. 09-CV-685, 2011 WL 7640125, at \*9 (N.D.N.Y. Aug. 16, 2011) ("The existence of a post-deprivation remedy under the FTCA for . . . just compensation is sufficient to satisfy the Due Process Clause and precludes a Fifth Amendment challenge of the nature now raised."), *report and recommendation adopted sub nom.*, *Thompson v. Baldwin*, 2012 WL 1033674 (N.D.N.Y. Mar. 27, 2012).

Accordingly, Plaintiff's Fifth Amendment due process claim must be dismissed.[9]

_____

[9] As Plaintiff's *Bivens* claims are dismissed in their totality, the Court need not address Defendants' argument that Plaintiff's claims should be dismissed as to Defendants Iocolano, Dalessandro, and McPhillips because Plaintiff's submissions contain no substantive allegations against them.  (Ds' Mem. at 14); *see Sebolt*, 2021 WL 4948959, at \*4 ("Because there is no *Bivens* remedy available to [plaintiff], the Court need not address the defendants' second argument—that [he] failed to plead facts showing that [three] defendants . . . were personally involved in the alleged constitutional deprivation."); *Dodd v. Potter*, No. 09-CV-1148, 2010 WL 11493112, at \*5 (W.D. Tenn. Sept. 22, 2010) ("Based on the Court's conclusion that the Plaintiff's *Bivens* claim will not lie, it need not address the [defendants'] remaining arguments concerning this claim . . . .").

Similarly, the Court declines to address the issue of qualified immunity *sua sponte*.  *See Edwards*, 2022 WL 309393, at \*10 n.8 ("The Court will not opine on whether defendants are entitled to qualified immunity . . . because Plaintiff has not plausibly pled that he is entitled to relief."); *McIntyre v. United States Marshals Serv.*, No. 18-CV-1268, 2023 WL 2447424, at \*8

## E.  **Leave to Amend**

Leave to amend a complaint should be freely given "when justice so requires."  Fed. R.

Civ. P. 15(a)(2).  "[I]t is within the sound discretion of the district court to grant or deny leave to

amend."  *Kim v. Kimm*, 884 F.3d 98, 105 (2d Cir. 2018).  "Leave to amend . . . may properly be

denied" for "'repeated failure to cure deficiencies by amendments previously allowed'" or

"'futility of amendment,'" among other reasons.  *Ruotolo v. City of N.Y.*, 514 F.3d 184, 191 (2d

Cir. 2008) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

Plaintiff has already amended his Complaint once and forfeited, or at least waived, an

opportunity to amend a second time, despite having the benefit of Defendants' pre-motion letter

setting forth their grounds for the motion, (*see* ECF No. 87), and the Court's observations during

the ensuing pre-motion conference, (*see* Minute Entry dated Mar. 29, 2023), and despite being

granted nearly eight months in which to do so, (*see* ECF Nos. 95-96).  In general, a plaintiff's

failure to fix deficiencies in a previous pleading, after being provided notice of them, is alone

sufficient ground to deny leave to amend.  *See Nat'l Credit Union Admin. Bd. v. U.S. Bank Nat'l*

*Ass'n*, 898 F.3d 243, 257-58 (2d Cir. 2018) ("When a plaintiff was aware of the deficiencies in

his complaint when he first amended, he clearly has no right to a second amendment even if the

proposed second amended complaint in fact cures the defects of the first.  Simply put, a busy

district court need not allow itself to be imposed upon by the presentation of theories *seriatim*.");

*In re Eaton Vance Mut. Funds Fee Litig.*, 380 F. Supp. 2d 222, 242 (S.D.N.Y. 2005) (denying

leave to amend because "the plaintiffs have had two opportunities to cure the defects in their

complaints, including a procedure through which the plaintiffs were provided notice of defects in

---

(D.N.J. Mar. 9, 2023) ("Because [plaintiff's] claims are not viable under *Bivens*, I do not address
. . . qualified immunity . . . .") (collecting cases).

the Consolidated Amended Complaint by the defendants and given a chance to amend their

Consolidated Amended Complaint," and "plaintiffs have not submitted a proposed amended

complaint that would cure these pleading defects"), *aff'd sub nom. Bellikoff v. Eaton Vance*

*Corp.*, 481 F.3d 110, 118 (2d Cir. 2007) (*per curiam*) ("[P]laintiffs were not entitled to an

advisory opinion from the Court informing them of the deficiencies in the complaint and then an

opportunity to cure those deficiencies.").

      Further, Plaintiff has not suggested that he is in possession of facts that would cure the

deficiencies identified in this ruling.  *See TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505

(2d Cir. 2014) (plaintiff need not be given leave to amend if plaintiff fails to specify how

amendment would cure the pleading deficiencies in the complaint); *Gallop v. Cheney*, 642 F.3d

364, 369 (2d Cir. 2011) (district court did not err in dismissing claim with prejudice in absence

of any indication plaintiff could or would provide additional allegations leading to different

result); *Horoshko v. Citibank, N.A.*, 373 F.3d 248, 249-50 (2d Cir. 2004) (*per curiam*) (district

court did not abuse its discretion by not granting leave to amend where there was no indication

as to what might have been added to make the complaint viable and plaintiffs did not request

leave to amend).

      Indeed, because "[t]he problems with the dismissed claims are substantive" and "better

pleading will not cure them," *Leschak v. Raiseworks, LLC*, No. 14-CV-8072, 2016 WL

11695068, at *10 (S.D.N.Y. Mar. 7, 2016), amendment would be futile, *Trombetta v. Novocin*,

414 F. Supp. 3d 625, 634 (S.D.N.Y. 2019); *see Boswell v. Bimbo Bakeries USA, Inc.*, 570 F.

Supp. 3d 89, 97 (S.D.N.Y. 2021); *Roundtree v. N.Y.C.*, No. 19-CV-2475, 2021 WL 1667193, at

*6 (S.D.N.Y. Apr. 28, 2021) (collecting cases).

      Accordingly, the Court declines to grant Plaintiff leave to amend *sua sponte*.

**IV.**    **CONCLUSION**

For the foregoing reasons, Defendants' motion to dismiss is GRANTED.  The Clerk of Court is respectfully directed to terminate the pending motion, (ECF No. 102), close the case, and mail a copy of this Opinion & Order to Plaintiff Mujahid Nasiruddin, No. 32770-037, at the address on the docket and at FCI Edgefield, Federal Correctional Institution, P.O. Box 725, Edgefield, SC 29824.

**SO ORDERED.**

Dated:  May 17, 2024
        White Plains, New York

_____
CATHY SEIBEL, U.S.D.J.